IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CATHERINE CHEEK and GILMER L. CHEEK, | § | |
| Individually and as Personal Representatives | § | |
| of the Estate of GREGORY L. CHEEK, | § | |
| Deceased; and CORIN ELIZABETH CEJA, | § | |
| as Guardian and Custodian of | § | |
| P.E.C., A Minor Child | § | |
| | § | |
| vs | § | Civil Action No. 2:13-cv-26 |
| | § | |
| NUECES COUNTY, TEXAS; | § | |
| NUECES COUNTY SHERIFF JIM KAELIN, | § | |
| Individually; NAPHCARE, INC.; | § | |
| DANIELA BADEA-MIC, M.D.; | § | |
| SUZAN SALTER, P.A.; and | § | |
| GILBERTO MALDONADO, M.D. | § | |

**PLAINTIFFS' FIRST AMENDED ORIGINAL COMPLAINT**

Plaintiffs, **CATHERINE CHEEK and GILMER L. CHEEK, Individually and as Personal Representatives of the Estate of GREGORY L. CHEEK, Deceased;** and **CORIN ELIZABETH CEJA, as Guardian and Custodian of P.E.C., A Minor Child**, complain of and about **NUECES COUNTY, TEXAS; NUECES COUNTY SHERIFF JIM KAELIN, Individually; NAPHCARE, INC.; DANIELA BADEA-MIC, M.D.; SUZAN SALTER, P.A.; and GILBERTO MALDONADO, M.D.**, Defendants, and for cause of action show:

**I.  PARTIES**

**A.  Plaintiffs**

1. Plaintiffs, **CATHERINE CHEEK** ("Mrs. Cheek") and **GILMER L. CHEEK** ("Mr. Cheek"), are residents of Harris County, Texas.  These Plaintiffs are the parents of

**GREGORY L. CHEEK** ("Gregory") and act herein individually and as Personal Representatives of their son's Estate.

2.  Plaintiff, **CORIN ELIZABETH CEJA**, is a resident of Madison County, Tennessee. This Plaintiff acts herein as the Guardian and Custodian of the minor child, **P.E.C.**, the daughter of **GREGORY L. CHEEK**, pursuant to the Order Appointing Guardian and Granting Custody entered by the Juvenile Court of Madison County, Tennessee at Jackson in Docket No. 53-46,863 on February 14, 2012.

### B.  Defendants

3.  Defendant, **NUECES COUNTY, TEXAS** (the "County"), is a political subdivision of the State of Texas.  This Defendant may be served with process by serving the Nueces County Attorney Laura Garza Jimenez at 901 Leopard Street, Room 207, Corpus Christi, Texas 78401.  The County funds and operates the jail, employs and compensates the jail staff, and is charged with ensuring that, at all times, the jail remains in compliance with federal and state law.  The County is a recipient of federal funds.

4.  Defendant, **NUECES COUNTY SHERIFF JIM KAELIN** (the "Sheriff"), may be served with process at his office located at 901 Leopard Street, Corpus Christi, Texas  78401.  At all relevant times, Jim Kaelin was the Sheriff in charge of the Nueces County Jail.  The Sheriff was responsible for Gregory's safekeeping and care.  He was acting under color of law.  He is sued for damages in his individual capacity.

5.  Defendant, **NAPHCARE, INC.** ("NaphCare"), is an Alabama corporation doing business in Nueces County, Texas.  This Defendant can be served by serving its registered agent for service, Ron Smith, c/o ASA, 3610-2 N. Josey, Suite 223, Carrollton, Texas 75007.  Nueces County

contracted with NaphCare to provide medical care to the prisoners incarcerated at the jail. NaphCare was acting under color of law, and was responsible for providing the constitutionally required medical and mental health care to prisoners at the jail.

6. Defendant, **DANIELA BADEA-MIC, M.D.** ("Dr. Badea-Mic"), is a resident of Nueces County, Texas and may be served at her office located at Comprehensive Medical Care, 527 Gordon Street, Corpus Christi, Texas 78404. She was acting under color of law. She is sued for damages in her individual capacity.

7. Defendant, **SUZAN SALTER, P.A.** ("Salter"), is a resident of Nueces County, Texas and may be served at her place of employment, Thomas-Spann Clinic, 7121 S. Padre Island Drive, Corpus Christi, Texas 78414. She was acting under color of law. She is sued for damages in her individual capacity.

8. Defendant, **GILBERTO MALDONADO, M.D.** ("Dr. Maldonado"), is a resident of Nueces County, Texas and may be served at his office, 5934 S. Staples, Suite 220, Corpus Christi, Texas 78413. He was acting under color of law. He is sued for damages in his individual capacity.

## II. JURISDICTION

9. Jurisdiction is invoked pursuant to 28 U.S.C. §1331 because the claims involve a question of federal law under 42 U.S.C. §1983 and 42 U.S.C., §§12181, *et seq.*, the Americans with Disabilities Act (ADA), and the Rehabilitation Act, 29 U.S.C. §794.

10. Additionally and in the alternative, Defendants, **NAPHCARE, INC.; DANIELA BADEA-MIC, M.D.; SUZAN SALTER, P.A.** and **GILBERTO MALDONADO, M.D.**, provided health care which departed from acceptable standards of health care or health care safety which are an additional proximate cause of Plaintiffs' injuries and damages. Pursuant to §74.051, TEX. CIV.

PRAC. & REM. CODE, Plaintiffs provided notice of the portion of this case that involves a health care liability claim by certified mail, return receipt requested, to these Defendants. This Court further has pendant and ancillary jurisdiction over these related state-law claims pursuant to 28 U.S.C. §1367(a).

11.     All conditions precedent to filing this action have been fulfilled.

### III.  VENUE

12.     Venue is proper in this cause in the Southern District of Texas pursuant to 28 U.S.C. §1391(a)(2) because all or a substantial part of the events which gave rise to this cause of action occurred in the Southern District of Texas.

### IV.  FACTS

13.     Gregory Cheek had a long-standing history of mental illness, including a diagnosis of bipolar disorder with intermittent psychotic episodes, schizophrenia, delusions and hallucinations.

14.     Bipolar disorder is a chronic mental illness.  People with severe bipolar disorder can be prone to psychotic episodes, periods of extreme hyperactivity, and can become delusional and have hallucinations.  Gregory experienced disordered thinking, delusions and hallucinations and, as a result, was unable to care for himself during these periods of time.

15.     Bipolar disorder is a physiological condition affecting body systems, including the neurological system.

16.     Bipolar disorder substantially limited Gregory's major life activities, including caring for himself, thinking, communicating and working.  During his psychotic episodes, Gregory was unable to care for himself and engaged in behavior that put his health and well-being in jeopardy. His sleeping and eating would be severely interrupted, and his ability to concentrate, think and

communicate clearly was severely impaired. Gregory was not able to hold employment due to his long-standing condition.

17. Gregory had also been diagnosed with paranoid schizophrenia, another chronic mental illness. People with schizophrenia experience problems sleeping, bizarre movements, delusions, hallucinations, disordered thinking, and suicidal thoughts or behaviors.

18. Schizophrenia is a mental impairment that substantially limited Gregory's major life activities of caring for himself, thinking, communicating and working.

19. Because of his serious mental disabilities, Gregory had been involuntarily committed to inpatient mental health facilities on several occasions.

20. Gregory was arrested on October 22, 2010 for criminal mischief when he was in an obvious psychotic state with his body covered in two cans of blue spray paint. Despite his mental condition, on arrest, he weighed 175 pounds and was in good physical health.

21. Unfortunately, in the months preceding the October 22, 2010 arrest, Gregory had previously been incarcerated in the Nueces County Jail for minor offenses related to his mental illness. During his previous incarcerations, Nueces County officials learned Gregory suffered from serious mental illnesses, and had even placed him on suicide watch. Officials at the Nueces County Jail knew Gregory suffered from a serious mental illness and was a person with a disability.

22. Although bond for Gregory's release was set at only $3,500, he was unable to pay any amount to be released.

23. Shortly after his arrest, Gregory's mother, Catherine Cheek, contacted the jail, providing Gregory's psychiatric history and her contact information. Mrs. Cheek was denied

information regarding her son's condition on multiple occasions and was told she was not on the visitor's list for her son.

24.     Gregory was again put on suicide watch at the jail, under heightened observation because of his obvious serious mental illness. On one occasion, he tore up his mattress and draped it around his head before being discovered by jail staff.

25.     During his detention, Gregory displayed grossly psychotic behavior with delusions, incoherence, and constant physical activity. Due to his mental state, he was unable to participate in his own defense or health care. On November 10, 2010, Dr. Maldanado, the jail's own psychiatrist, recommended the reasonable accommodation of transferring Gregory to a mental hospital for inpatient care, writing "NEED TO GO TO STATE HOSPITAL." Dr. Maldonado's recommendation was ignored and not followed, and Gregory remained incarcerated at the jail.

26.     Gregory had many psychotic episodes during his incarceration. Employees of the County and NaphCare recorded that he flooded his cell with water, spent hours talking to himself, swore incoherently, was writing on the walls, singing and dancing, and maniacally exercised in his cell, running in place and doing pushups. On multiple occasions, he refused his prescribed psychiatric medication. Records show jail staff described him as "delusional," "paranoid," "rambling," and "incoherent" with "garbled speech."

27.     On November 30, 2010, Dr. Maldanado again recommended that Gregory be transferred to a mental hospital for inpatient care. Dr. Maldonado believed the transfer was a reasonable accommodation for Gregory's disability and serious medical condition. Gregory's condition was rapidly deteriorating. Yet again, the jail did not transfer him in response to either of Dr. Maldonado's recommendations and requests.

28.     Even after seeing that Gregory remained in the jail, Dr. Maldonado failed to administer antipsychotic medication to Gregory as his past medical history and the severity and urgency of the situation warranted.  It was not until November 10, 2010 that Dr. Maldonado ordered injectable antipsychotic medication.  However, this order was not continued and Gregory only received four doses of this medication.  Subsequent orders for injectable antipsychotic medications were not followed by the jail medical staff, and Gregory remained unmedicated for his serious mental illness.  Although Dr. Maldonado knew this order was not being followed, he took no action to ensure that Gregory received the prescribed psychiatric medication during his incarceration at the jail.  In fact, Dr. Maldonado simply wrote in his order to "continue current care" even though there was not care being provided.  Dr. Maldonado, despite his knowledge that Gregory needed to be in a psychiatric hospital, continued his "current care" which included no medication and no treatment.

29.     On November 22, 2010, Gregory requested that his mother be allowed to visit him in jail.  However, the jail denied his request because he could not remember his mother's birth date due to his severe mental illness.  Therefore, his mother was not allowed to visit him in jail, which would have helped Gregory's mental state and aided health care providers in their later treatment of him.

30.     Nueces County entered into a contract with NaphCare by which NaphCare took over the inmate health care services on December 1, 2010 for the prisoners at the Nueces County Jail.

31.     NaphCare is a private Alabama corporation, licensed to do business in Texas, and provides medical care to prisoners pursuant to contract in prisons and jails around the country. NaphCare is known to provide constitutionally inadequate medical care in several other prisons and jails.  For example:

a.   NaphCare denied HIV medication to HIV-positive prisoners in the Alabama Department of Corrections in 2004, resulting in a large settlement paid to Alabama prisoners. Alabama officials reported "they cut corners. That's how they make a profit."

b.   Three Alabama counties declined to renew contracts with NaphCare after receiving numerous complaints from inmates, family members, and jail officials.

c.   Two inmates at the Jefferson County, Texas jail died of complications of diabetes while under NaphCare's care. Another prisoner needed a double leg amputation due to medical neglect at NaphCare's hands.

d.   Serious complaints have also been lodged against NaphCare in New York, Ohio and Pennsylvania.

32.   Despite the County's knowledge that NaphCare provided constitutionally inadequate health care, it adopted a policy, practice and custom of entrusting treatment of prisoners' serious medical conditions to NaphCare and employed incompetent medical and mental health care providers.

33.   On December 20, 2010, the Honorable Judge Marciela Saldana determined that Gregory Cheek was not competent to stand trial as a result of his serious mental illness and ordered the Sheriff to transfer him to a facility designated by the Department of State Health Services for a period not to exceed 120 days. Despite the Judge ordering the Sheriff to provide Gregory this reasonable accommodation for his disability, the County did not transfer Gregory to such a facility.

34.   The County's policy, practice and custom was to fail to timely transfer mentally ill prisoners to inpatient psychiatric facilities, even when their inpatient commitment was ordered by local judges. The County's policy, practice and custom denied Gregory a reasonable accommodation for his mental illness.

35. Sheriff Kaelin was aware the jail failed and refused to timely transfer mentally ill prisoners to inpatient psychiatric facilities. Despite knowing severely mentally ill people, like Gregory, were incarcerated in his jail, he took no action to transfer these people to inpatient psychiatric facilities.

36. Jail is an inappropriate setting for people like Gregory with serious mental illnesses in need of inpatient hospitalization. Gregory needed to be hospitalized because in his psychotic state he was an immediate danger to himself, and due to his inability to care for himself, he was unable to obtain medical care for himself in a setting like the Nueces County Jail. As Dr. Maldonado and Judge Saldana recognized, transferring Gregory to an inpatient mental health facility was a reasonable accommodation for Gregory's mental illness. Indeed, NaphCare employees noted it was difficult to treat Gregory because he was a "very poor historian due to mental illness." On multiple occasions, due to his mental illness, Gregory would remove his clothing, tear up his clothing and bedding, mumble incoherently, and jump up and down on his bed frame and commode.

37. When NaphCare assumed care for the inmates at the jail, Dr. Badea-Mic became the jail's psychiatrist, even though NaphCare knew (or should have known) Dr. Badea-Mic had a history of action being taken against her by the Texas Board of Medical Examiners. Despite knowing Dr. Maldonado and Judge Saldana ordered Gregory transferred to an inpatient mental health facility, Dr. Badea-Mic took no action to assure his transfer, in deliberate indifference to his serious medical needs.

38. Dr. Badea-Mic compounded this error by failing to supervise the licensed professional counselors caring for Gregory. Despite knowing about his serious psychiatric condition, Dr. Badea-Mic only required the licensed professional counselors to periodically observe Gregory.

She made no efforts to provide him with treatment for his serious medical needs, which could have included onsite injections of an antipsychotic medication or transfer to a local hospital for inpatient psychiatric care. Further, Dr. Badea-Mic ignored requests from the licensed professional counselors to check on Gregory and provide him injectable medication for his worsening psychosis.

39. When NaphCare took over care of the prisoners at the jail, it knew Gregory had been ordered transferred to an inpatient psychiatric facility. Despite this knowledge, NaphCare did nothing to provide appropriate mental health care for Gregory's serious medical needs.

40. On December 28, 2010, Gregory began to develop a problem in his legs. He legs were swollen and he complained of pain. Despite his obvious need for medical treatment, he received no treatment for this serious medical condition.

41. Gregory continued to experience problems in his legs, and on January 5, 2011, he was brought to the nurses' station with the concern about his legs. Documentation reflects that both of his feet were swollen and red. The NaphCare employees failed to perform a complete assessment but instead attributed his complaints to the fact that he "stands all day" and he was returned to his cell without any substantial physical exam or treatment.

42. Because of his severe mental illness, Gregory was unable to express his needs, including the seriousness of his medical condition, even though it should have been obvious to competent health care providers. The County denied him a reasonable accommodation for his disability by failing to have him examined by a qualified mental health professional or transfer him to an inpatient psychiatric facility.

43. By February 2, 2011, Gregory had lost so much weight he had become cachexic and his legs were extremely swollen, purple and red with scratches that were visible. Bodily fluid had

begun to seep from his legs and saturate his pants. He was seen by the physician assistant Salter who noted that he had multiple complaints of problems with his legs in the past. However, she ordered only a diuretic and did not conduct simple testing, such as lab work, or wound cultures to diagnose the infection in his legs, although his serious medical condition was obvious. Gregory was compliant in taking this medication. She misdiagnosed Gregory's condition and did not refer him to a physician as would have been appropriate.

44. During this time, the weather had become extremely cold with freezing temperatures throughout much of the day and night, and Gregory was without a blanket and/or mattress for much of the time.

45. By February 4, 2011, Gregory's medical condition had further deteriorated. Gregory complained of the cold and the lack of a mattress and blanket. His legs continued to be swollen and to weep, saturating his clothing. In his weakened condition, he fell in his cell. When discovered, nurses for NaphCare documented a body temperature of 95.6º. The wounds to his legs were cleaned, but Gregory was provided no further evaluation or medication for the infection in his legs, including contacting a physician to evaluate the ongoing problem or transfer to a local emergency room, despite the obviousness of his serious medical condition.

46. On February 5, 2011, Gregory was found shivering and cold in his cell. By the early morning hours of February 6, 2011, Gregory was found lying on the floor unresponsive in his cell. His body was very cold to touch and the medical personnel could not obtain a blood pressure or oxygenation status. However, instead of being immediately and emergently transferring him to a hospital, the NaphCare medical staff delayed and moved Gregory to the jail's infirmary for further

evaluation. There it was discovered that, in addition to the prior symptoms, his EKG also was markedly abnormal. As Gregory was near death, he was finally transferred to the hospital.

47. At the hospital, Gregory was found to be hypothermic and hypoglycemic, with sepsis and rhabdomyolysis. Shortly after arriving, he suffered a cardiac and respiratory arrest. The hospital staff performed CPR and placed him on life support.

48. Tragically, the doctors determined that Gregory was terminal and would not survive. His mother was contacted, and following last rites, life support was terminated. Gregory Cheek died in the early morning hours of February 7, 2011 at the age of 29.

49. Blood cultures drawn at the hospital reveal that the same bacteria that was present in the wounds in Gregory's legs had infected his blood stream. His cause of death was ruled as Waterhouse Friderichsen Syndrome due to a bacterial infection (serratia marcescens). At the time of his death, he weighed only 146 pounds.

## V. CAUSES OF ACTION

### Count I – Violation of 42 U.S.C. §1983 – County, Sheriff, NaphCare, Dr. Badea-Mic and Dr. Maldonado

50. Plaintiffs incorporate the allegations of paragraphs 1 through 49 above.

51. The County, Dr. Maldonado, Sheriff, NaphCare and Dr. Badea-Mic violated Gregory's Fourteenth Amendment right to be free from cruel and unusual punishment. Plaintiffs sue for these violations under 42 U.S.C. §1983. The County, Dr. Maldonado, Sheriff, NaphCare and Dr. Badea-Mic acted deliberately indifferent to Gregory's serious medical needs in the following actions/inactions:

   a. Not transferring Gregory to an inpatient psychiatric facility, even though it had been twice ordered by his treating psychiatrist and then again by the Honorable Judge Marciela Saldana;

    b.    Not initiating injectable antipsychotic medication to treat Gregory's known grossly psychotic state;

    c.    Ordering "continue current care" when the current care was no medications and no treatment; and

    d.    Not providing medications that were ordered by the physician.

These Defendants were well aware of Gregory's serious medical condition and risk of serious injury, but failed to act.

52. Additionally, the County had a policy, practice and custom of providing inadequate mental health care services and not transferring mentally ill inmates to inpatient psychiatric hospitals when necessary to protect their lives. The County negligently and intentionally failed to transfer Gregory to a facility designated by the Department of State Health Services, despite the commitment order of Judge Saldana entered on December 20, 2010. Instead, the County held Gregory in its jail, providing what constituted as no mental health care services to Gregory. Those failures killed him.

53. These acts were a proximate cause of the damages suffered by Plaintiffs. Plaintiffs are entitled to the maximum amount of compensatory damages allowed by law.

## Count II – Violation of Fourteenth Amendment – County, Sheriff, Dr. Maldonado and Dr. Badea-Mic

54. Plaintiffs incorporate the allegations of paragraphs 1 through 49 above.

55. The County, Sheriff, Dr. Maldonado and Dr. Badea-Mic, acting under color of law, intentionally and with conscious, callous and deliberate indifference to Gregory's constitutional rights, deprived him of his Fourteenth Amendment right to protection against self-harm while in protective custody. Plaintiffs bring this claim through 42 U.S.C. §1983.

56. These Defendants, acting under color of law, intentionally and with conscious, callous and deliberate indifference to Gregory's constitutional rights, deprived him of his Fourteenth Amendment right to receive health care for his serious medical conditions.

57. The policy, practice and custom of these Defendants of failing to provide medical and mental health care for inmates with serious medical conditions resulted in Gregory's death.

**Count III – Violation of ADA and Rehabilitation Act – County and NaphCare**

58. Plaintiffs incorporate the allegations of paragraphs 1 through 49 above.

59. The County has been, and is, a recipient of federal funds. The Rehabilitation Act requires recipients of federal funds to reasonably accommodate persons with mental disabilities in their facilities, program activities, and services, and to reasonably modify such facilities, services and programs to accomplish this purpose. 29 U.S.C. §794.

60. Further, Title II of the ADA applies to the County and NaphCare (because it was implementing a function of a public entity) and has the same mandate as the Rehabilitation Act. 42 U.S.C. §§12131, *et seq.*

61. Likewise, Title III of the ADA applies to NaphCare as a private corporation and requires NaphCare to make reasonable accommodations for people's disabilities.

62. The Nueces County Jail is a facility and its operation comprises a program and service for purposes of the Rehabilitation Act and ADA.

63. For purposes of the ADA and Rehabilitation Act, Gregory was a qualified individual regarded as having a mental impairment that substantially limited one or more of his major life activities.

64. The County and NaphCare knew Gregory suffered from bipolar disorder, was being treated with psychiatric medications, and had been declared mentally incompetent to stand trial while incarcerated at the jail.

65. The County and NaphCare deliberately refused to reasonably accommodate Gregory's mental disability while in custody, in violation of the ADA and Rehabilitation Act. That intentional failure killed him.

66. The County and NaphCare refused to reasonably modify their facilities, services, accommodations, and programs to reasonably accommodate Gregory's mental disability in violation of the ADA and Rehabilitation Act. That failure killed him.

67. Gregory died because of the intentional discrimination against him by the County and NaphCare. Plaintiffs are entitled to the maximum amount of compensatory damages allowed by law.

### Count IV – Additionally and In the Alternative, Negligence – NaphCare, Dr. Maldonado, Dr. Badea-Mic and Salter

68. Plaintiffs incorporate the allegations of paragraphs 1 through 49 above.

69. Additionally and in the alternative, Dr. Maldonado, Dr. Badea-Mic, NaphCare, by and through its agents and employees, and Salter provided medical care, advice and treatment to Gregory during his incarceration described above that violated their duties of care owed to Gregory to exercise that degree of care, skill, supervision and diligence ordinarily possessed and used by other medical providers under the same or similar circumstances.

70. More specifically, these Defendants were negligent in the following respects and particulars, among others:

   a. Not transferring Gregory to an inpatient psychiatric facility, even though it had been twice ordered by his treating psychiatrist and then again by the Honorable Judge Marciela Saldana;

  b.  Not initiating injectable antipsychotic medication to treat Gregory's known grossly psychotic state;

  c.  Ordering "continue current care" when the current care was no medications and no treatment;

  d.  Not providing medications that were ordered by the physician;

  e.  By negligently failing to recognize the signs and symptoms of a developing infection in Gregory's legs, and failing to provide appropriate and timely treatment;

  f.  By negligently failing to monitor the infection present in Gregory's legs;

  g.  By inappropriately relying on non-medical providers to monitor the condition of Gregory's legs;

  h.  By negligently failing to perform proper assessments of Gregory's medical condition;

  i.  By negligently failing to timely transfer Gregory to a medical facility that could properly treat the infection;

  j.  By negligently failing to consult with a physician who could accurately diagnose and treat Gregory's condition;

  k.  By negligently misdiagnosing Gregory's leg infection as a cardiac condition;

  l.  By negligently failing to provide proper supervision and training to the nurses at the jail; and

  m.  By negligently failing to ensure Gregory's medical care when they knew of Gregory's serious condition.

71. NaphCare was additionally negligent in hiring incompetent and insufficiently trained providers to provide mental and medical health care at the Nueces County Jail.

72. Each and every negligent act, individually and taken together, of NaphCare, by and through its agents and employees, Salter and Mullins proximately caused Gregory's damages. Gregory's own conduct did not contribute to the injuries in any way, and but for the negligence of

NaphCare, by and through its agents and employees, Salter and Mullins, Gregory would not have been injured.

73. As a proximate result of the negligence of NaphCare, by and through its agents and employees, Salter and Mullins, Plaintiffs have been damaged in an amount within the jurisdiction of this Court.

**Count V – Gross Negligence – NaphCare, Dr. Maldonado, Dr. Badea-Mic and Salter**

74. Plaintiffs incorporate the allegations of paragraphs 1 through 49 above.

75. The conduct of NaphCare, by and through its agents and employees; Dr. Maldonado, Dr. Badea-Mic and Salter, individually, was extreme, outrageous, unconscionable, and reckless and constitutes malice or gross negligence.

76. As a result, Plaintiffs sue for exemplary damages in an amount in excess of the minimum jurisdictional limits of the Court.

**Count VI – Wrongful Death Claim**

77. Plaintiffs incorporate the allegations of paragraphs 1 through 76 of this Complaint.

78. Catherine Cheek and Gilmer L. Cheek, Individually, and Corin Elizabeth Ceja, as Guardian and Custodian of P.E.C., A Minor Child, bring this wrongful death action against Defendants for the death of Gregory Cheek for their own damages and for the damages to the other statutory beneficiaries arising from the injuries which caused Gregory's death. Defendants are liable as the injuries were caused by their wrongful act, neglect, carelessness, and by the wrongful act, neglect, and carelessness of their agents and employees as set forth above.

79. Catherine Cheek and Gilmer L. Cheek, Individually, and Corin Elizabeth Ceja, as Guardian and Custodian of P.E.C., A Minor Child, request damages for the loss of consortium of

the statutory beneficiaries resulting from the death of Gregory Cheek; loss of advice, counsel, companionship, society and affection; grief and mental anguish, bereavement and mental trauma, and emotional damages they suffered as a result of the death of Gregory Cheek.

## VI.  JURY REQUEST

80.  Plaintiffs request a jury trial.

## VII.  PRAYER FOR RELIEF

Plaintiffs pray that Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for Plaintiffs and against Defendants, jointly and severally, including damages, costs of Court, attorney fees, and such other and further relief to which Plaintiffs may be entitled at law or in equity.

RESPECTFULLY SUBMITTED,

OF COUNSEL:

ANGELA SPEARS
Texas State Bar No. 00792866
MARIAN S. ROSEN & ASSOCIATES
5065 Westheimer, Suite 840
Houston, Texas  77056
(713) 222-6464  (ofc)
(713) 227-4703  (fax)

SCOTT MEDLOCK
Texas State Bar No. 24044783
S. Dist. No. 608457
THE TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, Texas  78741
(512) 474-5073  (ofc)
(512) 474-0726  (fax)

*/s/   Marian S. Rosen*
MARIAN S. ROSEN
Texas State Bar No. 17263000
Federal ID No. 6559
5065 Westheimer, Suite 840
Houston, Texas  77056
(713) 222-6464  (ofc)
(713) 227-4703  (fax)

ATTORNEY-IN- CHARGE
FOR PLAINTIFFS