UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

CATHERINE CHEEK, *et al*,                    §
                                             §
        Plaintiffs,                          §
VS.                                          §        CIVIL ACTION NO. 2:13-CV-26
                                             §
NUECES COUNTY TEXAS, *et al*,                §
                                             §
        Defendants.                          §

## <u>ORDER</u>

This is an action under the Civil Rights Act, Americans With Disabilities Act, and the Rehabilitation Act for alleged violations leading to the death of Gregory L. Cheek (Gregory).  Gregory died while being detained pending transfer to a psychiatric facility where he was to undergo treatment to restore competency to stand trial on a charge of criminal mischief.  Before the Court are three motions:  (1) "Defendant Sheriff Jim Kaelin's 12(b) Motion to Dismiss for Failure of Plaintiff's Amended Complaint to State a Claim on Which Relief May Be Granted Based on Immunity" (Sheriff's Motion, D.E. 55); (2) "Nueces County's Rule 12(b)(6) Motion to Dismiss in Response to Second Amended Complaint" (County's Motion, D.E. 60); and (3) "Defendants NaphCare, Inc. and Suzan Salter P.A.'s 12(c) Motion to Dismiss" (NaphCare and Salter's Motion, D.E. 64).

For the reasons set out below, the Sheriff's Motion is GRANTED on the basis of qualified immunity, the County's Motion is GRANTED IN PART, dismissing the ADA and Rehabilitation Act claims, and DENIED IN PART with respect to the § 1983 claims,

and NaphCare and Salter's Motion is GRANTED IN PART, dismissing the ADA and Rehabilitation Act claims, and DENIED IN PART with respect to the claim that the pleadings are insufficient to state § 1983 and state law negligence claims and with respect to their qualified immunity defense.

## JURISDICTION

This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 based on the Civil Rights Act of 1964, 42 U.S.C. § 1983; the Americans With Disabilities Act, 42 U.S.C. § 12132; and the Rehabilitation Act, 29 U.S.C. § 794.  Plaintiffs' state law claims are subject to supplemental jurisdiction under 28 U.S.C. § 1367(a).

## STANDARD OF REVIEW

To the extent that Defendants seek dismissal of this case under Fed. R. Civ. P. 12(b)(6), they argue that the Complaint (D.E. 47) fails to state a claim upon which relief can be granted.  Under Rule 12(c), the argument is that the pleadings cannot support a judgment.  The standard of review under Rules 12(b)(6) and 12(c) is the same.  *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).  The test of pleadings is devised to balance a party's right to redress against the interests of all parties and the court in minimizing expenditure of time, money, and resources.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1966 (2007).

The *Twombly* court expressly "retired" the old test stated in *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99 (1957) that a complaint would not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S.Ct. at 1969 (quoting *Conley, supra*).

The revised standard for determining whether a complaint states a cognizable claim has been outlined by the United States Supreme Court in *Twombly, supra* and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009).

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Furthermore, "Pleadings must be construed so as to do justice."  Rule 8(e).  The requirement that the pleader "show" that he is entitled to relief requires "more than labels and conclusions[;] a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 127 S.Ct. at 1964-65 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932 (1986)).

Factual allegations are required, sufficient to raise the entitlement to relief above the level of mere speculation.  *Twombly*, 127 S.Ct. at 1965.  Those factual allegations must then be taken as true, even if doubtful.  *Id.*  In other words, the pleader must make allegations that take the claim from "conclusory" to "factual" and beyond "possible" to "plausible."  *Id.*, 127 S.Ct. at 1966.  The *Twombly* court stated, "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  127 S.Ct. at 1974.

The Court, elaborating on *Twombly*, stated, "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  *Iqbal*, 129 S.Ct. at 1949.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  In dismissing the claim in *Iqbal*, the Court stated, "It is the conclusory nature of

respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."  129 S.Ct. at 1951.

Motions under Rule 12 can be granted not only because of a plaintiff's failure to state a positive claim but for failure to plead facts that can overcome an affirmative defense, such as limitations or immunity.  Even if some allegations support a claim, if other allegations negate the claim on its face, then the pleading does not survive the Rule 12 review.

> A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief. If the allegations, for example, show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim; that does not make the statute of limitations any less an affirmative defense, *see* Fed. Rule Civ. Proc. 8(c). Whether a particular ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on whether the allegations in the complaint suffice to establish that ground, not on the nature of the ground in the abstract.

*Jones v. Bock*, 549 U.S. 199, 215, 127 S.Ct. 910, 920-21 (2007).

## FACTUAL OVERVIEW

Gregory suffered from a number of mental disorders, including bipolar disorder with intermittent psychotic episodes, paranoid schizophrenia, delusions, and hallucinations.  He was found "disabled" by the Social Security Administration effective August 2009 and had been involuntarily committed to inpatient mental health facilities on several occasions.  Nueces County officials were aware of Gregory's disabilities before the incident at issue here, as he had been incarcerated for minor offenses in the past, his serious mental illness was disclosed, and he had been placed on suicide watch before.

On October 22, 2010, while otherwise healthy, Gregory was suffering a psychotic episode and was arrested on charges of criminal mischief.  At the time, he was covered in two cans of blue spray paint.  He did not have the financial ability to post bail and remained in jail while the County conducted a test of his competency pursuant to a magistrate's order.  The County placed Gregory on a suicide watch and noted a number of disturbing behaviors related to his mental illness.  Dr. Maldonado, "the jail's own psychiatrist," recommended that Gregory be transferred to a state hospital on November 10, 2010 and again on November 30, 2010 as Gregory's condition deteriorated.  While Dr. Maldonado ordered injections of an anti-psychotic medication beginning November 10, 2010, his orders were not followed.  Gregory's request that his mother be allowed to visit him was denied because he could not remember her date of birth.

Effective December 1, 2010, the County contracted with NaphCare to provide inmate health care services.  Plaintiffs allege the resulting agreement permitted inadequate staffing of medical providers for mental health services and that NaphCare was "known to provide constitutionally inadequate medical care in several other prisons and jails."  D.E. 47, p. 9.  NaphCare did no better job of providing Gregory with his prescribed psychological treatment.

On December 20, 2010, a District Judge determined that Gregory was not competent to stand trial because of his mental illness and ordered the Sheriff to transfer Gregory to an appropriate mental health facility designated by the Department of State Health Services for a period not to exceed 120 days.  According to Plaintiffs, despite the order and the notice of mental illness that it provided, the County and the Sheriff failed to

comply with the order, as was their "policy, practice and custom," and kept Gregory detained without sufficient mental health care. The "practice" that the Plaintiffs identify is having actual knowledge of an inmate's psychiatric condition and waiting for state hospital beds rather than procuring other inpatient treatment for mentally ill prisoners or finding another licensed mental health facility that would accept him.

On December 28, 2010, Gregory began to experience swelling and pain in his legs. He received no attention for that medical condition until January 5, 2011, when a nurse documented that his feet were swollen and red. Attributing this observation to Gregory's tendency to stand all day, she failed to provide any treatment. This dismissal of Gregory's medical condition continued as he became malnourished, lost significant weight, and his legs began turning red, draining fluid, and ulcerated, becoming infected with bacteria. According to Plaintiffs, the failure to provide mental health treatment so that Gregory could regain the ability to communicate his medical condition, the failure to provide antibiotics, the failure to provide warm shelter as the weather turned cold, and the failure to respond properly to the emergency of finding Gregory cold and unresponsive on his cell floor all led to his death at the age of 29 on February 7, 2011.

### THE CLAIMS AGAINST THE SHERIFF

According to Plaintiffs' Second Amended Complaint (D.E. 47), Sheriff Kaelin is sued as "the Sheriff and policymaker in charge of the Nueces County Jail. The Sheriff was responsible for Gregory's health, safety and welfare. He was acting under color of law. He is sued for damages in his individual capacity." D.E. 47, p. 2. The Sheriff is included in four causes of action: (1) violation of Gregory's Fourteenth Amendment

right to be free from cruel and unusual punishment with respect to deliberate indifference to Gregory's serious medical needs; (2) violation of Gregory's Fourteenth Amendment right to be free from cruel and unusual punishment with respect to protection against self-harm; (3) wrongful death without specification of liability theory; and (4) denial of Constitutional due process in failing to transfer custody of Gregory to a licensed mental health facility to restore his competency or, alternatively, failure to release Gregory when a mental health facility was not available.

## A. The Wrongful Death Claim is Not Barred Under Election of Remedies

The Sheriff's motion asserts that the wrongful death claim against him, individually, is barred by statutory election of remedies. Pursuant to the Texas Civil Practice & Remedies Code § 101.106:

> (a) The filing of a suit under this chapter against a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against any individual employee of the governmental unit regarding the same subject matter.

> (b) The filing of a suit against any employee of a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against the governmental unit regarding the same subject matter unless the governmental unit consents.

> . . .

> (e) If a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit.

> (f) If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only.  On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

This suit was originally filed against both Sheriff Kaelin and his governmental employer, Nueces County, Texas.   D.E. 1.   Therefore, neither subsection (a) (which is the subsection upon which the Sheriff relies) nor subsection (b) applies.  While Nueces County has filed a motion to dismiss, it has addressed only the claims made against it and has not moved to dismiss the Sheriff under subsection (e).  D.E. 15, 60.

Therefore, if the Sheriff seeks dismissal based upon this section of the Texas Civil Practice and Remedies Code, he must qualify for dismissal under subsection (f) and demonstrate that (i) the claims against him arise out of conduct within the general scope of his employment as Sheriff; and (ii) that the suit could have been brought under Chapter 101 against the County.  TEX. CIV. PRAC. & REM. CODE § 101.106(f).  It is clear that the claims made against the Sheriff are within the general scope of his employment as Sheriff because they relate to the treatment of a person detained in the county jail.  Therefore, dismissal of the wrongful death claim may be warranted pursuant to an election of remedies under the Texas Tort Claims Act if the wrongful death claim is properly brought against the County.

Counties enjoy sovereign immunity against state tort claims. TEX. CIV. PRAC. & REM. CODE § 101.001 et. seq. That immunity is waived for (1) property damage, personal injury, and death arising from the operation or use of a motor-driven vehicle or motor-driven equipment; and (2) personal injury and death caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law. *Id*, §§ 101.021, 101.025.

The Plaintiffs do not identify any motor-driven machinery or tangible property as the basis from which their claims arise. Instead, they complain of the jail's provision of medical and mental health services or the deprivation of those services. The prerequisites to a waiver of the County's sovereign immunity do not appear to be met here and no party argues that they are. Therefore, the Sheriff has failed to demonstrate that he is entitled to dismissal of the wrongful death claims against him under his Tort Claims Act election of remedies argument.

Nonetheless, as discussed below, the Court holds that the Sheriff, individually, is protected by the doctrine of qualified immunity for all specific theories Plaintiffs have alleged against him. Because no causes of action remain to be brought under the wrongful death umbrella, the wrongful death pleading does not provide a basis for retaining the Sheriff, individually, in this action.

**B. The Alleged Facts Support Individual Liability for Constitutional Claims**

The Sheriff's motion asserts that the pleading is factually insufficient to sustain liability against him in his individual capacity on any constitutional theory. Vicarious

liability theories do not apply to complaints of Constitutional violations. *Iqbal*, 129 S.Ct. 1948. "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id*. Individual liability under § 1983 for a supervisor may exist based either on "personal involvement in the constitutional deprivation," or "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987).

In a Rule 12(b)(6) case, the Court looks to the entirety of the Plaintiffs' pleading to determine if the facts state a viable claim. According to the face of the pleading, Constitutional rights implicated in this case include a pretrial detainee's (1) right to medical and mental health care; and (2) right to protection from self-harm. Each of these rights are well-established. The Fifth Circuit, *en banc*, has described the rights of pretrial detainees:

> Pretrial detainees and convicted prisoners, however, look to
> different constitutional provisions for their respective rights to
> basic needs such as medical care and safety. The
> constitutional rights of a convicted state prisoner spring from
> the Eighth Amendment's prohibition on cruel and unusual
> punishment, *see Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct.
> 285, 291, 50 L.Ed.2d 251 (1976), and, with a relatively
> limited reach, from substantive due process. The
> constitutional rights of a pretrial detainee, on the other hand,
> flow from both the procedural and substantive due process
> guarantees of the Fourteenth Amendment. *See Bell v. Wolfish*,
> 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).
> Significantly, *Bell* instructs that the State must distinguish
> between pretrial detainees and convicted felons in one crucial
> respect: The State cannot punish a pretrial detainee. *Id*. at
> 535, 99 S.Ct. at 1872 ("In evaluating the constitutionality of
> conditions or restrictions of pretrial detention that implicate

> only the protection against deprivation of liberty without due
> process of law, we think that the proper inquiry is whether
> those conditions amount to punishment of the detainee.").
> Since the State does punish convicted prisoners, but cannot
> punish pretrial detainees, a pretrial detainee's due process
> rights are said to be "at least as great as the Eighth
> Amendment protections available to a convicted prisoner."
> *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239,
> 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983).

*Hare v. City of Corinth, Mississippi,* 74 F.3d 633, 639 (5th Cir. 1996) (*en banc*).

Plaintiffs have not alleged facts on which the Sheriff, individually, had notice of any particular threat to Gregory based on inadequate mental health or medical treatment or risk of self-harm. There is no suggestion that Gregory's death was a suicide or that any medical condition was caused by actions that he took in order to harm himself. Rather, the Plaintiffs suggest that Gregory's inability to advocate for himself when he developed a need for medical treatment resulted in his harm. Nothing in Plaintiffs' pleading implicates the Sheriff, individually, in a self-harm injury.

The only claim in the pleading that remains viable against the Sheriff, individually, is the Constitutional right to adequate mental health and medical care. This right has been well-established and abundantly clear for some time. "Pretrial detainees have a constitutional right not to have confining officials treat their serious medical needs with deliberate indifference, under the Due Process Clause of the Fourteenth Amendment. *Estate of Allison v. Wansley*, 2013 WL 1983959, *6 (5th Cir. May 15, 2013) (citing *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000)). A pretrial detainee who is not competent to stand trial may be detained only for the

purpose of providing mental health treatment to restore competency. *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972).

The rubric for evaluating whether the pleading states the violation of the right to adequate mental health or medical care depends upon whether the complaint goes to "episodic acts or omissions" or "conditions of confinement." *Hare, supra* at 644-50; *Shepherd v. Dallas County*, 591 F.3d 445, 452-55 (5th Cir. 2009). An "episodic" claim is one that focuses on one individual's misconduct and requires proof of that individual's specific intent—that one or more state actors acted or failed to act with deliberate indifference to the detainee's needs. *Hare, supra* at 648.

A "conditions" claim focuses on an explicit policy or an unstated or *de facto* policy, as evidenced by an extensive or pervasive pattern of acts or omissions that are arbitrary or purposeless or not reasonably related to a legitimate governmental goal. *Id.* at 645; *Shepherd, supra* at 452 (citing *Bell v. Wolfish*, 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979)). The implementation of a policy is actionable when the policy is so deficient that it, itself, is a repudiation of constitutional rights and is the moving force behind the constitutional violation. *Thompkins v Belt*, 828 F.2d 298, 304 (5th Cir. 1987). In a "conditions" claim, the plaintiff is relieved of the burden of proof of an individual's actual intent to punish because intent may be inferred from the policy decision or pervasive practice of exposing a detainee to an unconstitutional condition. *Shepherd*, *supra* at 452 (citing *Scott v. Moore*, 114 F.3d 51, 53 n. 2 (5th Cir. 1997) (*en banc*)).

It is fair to say that Plaintiffs have stated an "episodic" claim as to the treating medical providers.  However, as to the Sheriff, the facts reflect a claim for his individual participation[1] in effectuating a policy of understaffing medical providers and thereby exposing Gregory to unconstitutional medical conditions.[2]  In finding that the plaintiff had stated a proper "conditions" case, the *Shepherd* court wrote:

> [A] detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights. Here, Shepherd demonstrated that serious injury and death were the inevitable results of the jail's gross inattention to the needs of inmates with chronic illness. In the absence of any legitimate penological or administrative goal, this amounts to punishment.

*Shepherd, supra* at 454.  Substituting "mental illness" for "chronic illness," the court could have been describing the allegations here.  While this Court is not yet faced with the determination of whether the evidence will support the allegations, the necessary conclusion is that the Plaintiffs have stated a "conditions" claim.  The question now is whether they pled sufficient facts involving the Sheriff, individually, to prevail at the motion to dismiss phase.

The Fifth Circuit's analysis in *Thompkins* is instructive:

> If Sheriff Belt did not knowingly disregard Thompkins' pleas to see a doctor, he cannot be held liable unless he knew the

---

[1]  A supervisor may be held liable where either (1) he is personally involved in the constitutional deprivation, or (2) there is a sufficient causal connection between his wrongful conduct and the constitutional violation.  *Thompkins, supra*.

[2]  This is the approach that Plaintiffs state they intended—simultaneous prosecution of an "episodic" case against medical care providers and a "conditions" case against the County.  D.E. 70, p. 20.  *See Lee v. Valdez*, 2008 WL 4130975, *6, 2008 U.S. Dist. LEXIS 68670, *11 (N.D. Tex. August 29, 2008) (allowing both theories of liability at the pleading stage).

> jail's system was so deficient as to expose prisoners to substantial risk of significantly unmet serious medical needs—i.e., was unconstitutional—and failed to properly attempt to correct it, and unless his action or inaction in this respect caused Thompkins' injuries.

*Thompkins, supra* at 304.   The Court has identified sixteen allegations of the Sheriff's personal involvement[3] in the Plaintiffs' Second Amended Complaint:

1. "Sheriff Kaelin actively participated in the negotiation process that resulted in awarding NaphCare the contract."  D.E. 47, p. 8.

2. "Further, under the terms of the contract as negotiated by Nueces County and Sheriff Kaelin, NaphCare was to staff the jail with inadequate numbers of staff to handle the mental health services in the jail."  *Id.*, p. 9.

3. "Sheriff Kaelin also reportedly contacted officials in Jefferson County, Texas to check on NaphCare."  *Id.*, p. 9.

4. "The County and Sheriff Kaelin were aware NaphCare provided grossly deficient care in the past and that NaphCare could not provide competent medical and mental health care at the rates under the contract . . . but still awarded it the contract."  *Id.*, p. 10.

5. "The Sheriff received the Order from the Court and had actual knowledge that Gregory had severe mental illness and needed to be transferred to an in-patient treatment facility."  *Id.*, p. 11.

6. "Continuing to house Gregory in conditions where the Sheriff knew he could not receive the prescribed mental health care exposed Gregory to an unconstitutional condition of confinement."  *Id.*, p. 11.

7. "The Sheriff, acting as county policymaker, made the deliberate decision to continue to house detainees like Gregory in the jail despite their serious mental illnesses and the County's known inability to

---

[3]   All other factual allegations are made with respect to the County, the jail, jail officials, jail staff, jail correctional officers, medical or health care providers, County employees, or jail employees and are thus irrelevant to the current inquiry regarding the Sheriff's personal liability.

provide crisis management of acute psychiatric episodes and stabilization of the mentally ill in the jail." *Id.*, p. 11.

8.   "Despite having this power [to control the jail population by refusing to accept nonviolent offenders or finding alternative facilities], the Sheriff routinely refused to exercise it to house nonviolent, mentally incompetent detainees like Gregory at appropriate inpatient psychiatric facilities." *Id.*, p. 11.

9.   "Sheriff Kaelin was aware the jail failed and refused to timely transfer mentally ill prisoners to inpatient psychiatric facilities." *Id.*, p. 12.

10.  "Upon information and belief, the Sheriff, acting as final policymaker for the County, had actual knowledge of long delays in transferring prisoners from the jail to inpatient psychiatric facilities for competency restoration.  Upon information and belief, the Sheriff knew the average wait time to be transferred was six months and that a waiting list for nonviolent detainees like Gregory typically had 400 prisoners at any given time." *Id.*, p. 12.

11.  "Sheriff Kaelin was aware of these deficiencies [occurring under his predecessor] and campaigned against the incumbent sheriff based on the loss of the federal contract prisoners." *Id.*, p. 14.

12.  "Sheriff Kaelin was aware of [another prisoner's] death [while awaiting psychiatric treatment] and spoke with the press about it." *Id.*, p. 14.

13.  "Sheriff Kaelin told the press he relied on medical staff to place a prisoner on suicide watch." *Id.*, p. 14.

14.  "The deaths of these [three described] prisoners gave the Sheriff and county policymakers actual knowledge that conditions in the jail were dangerous for mentally ill prisoners. . . Despite this actual knowledge, Sheriff Kaelin acted with deliberate indifference in failing to take corrective action." *Id.*, p. 14.

15. "The Sheriff was aware of these [failed inspections] violations and met with officials from the Commission about them." *Id.*, p. 18.

16. "The Sheriff had actual knowledge of [mentally ill prisoner Garcia's] problem [of languishing for months in the jail awaiting transfer to a psychiatric facility] following Mr. Garcia's death, but failed to take any action to protect the lives of subsequent prisoners, like Gregory." *Id.*, pp. 18-19.

The matters addressed in these allegations, in the context of the overall pleading, are sufficient to support constitutional claims against the Sheriff in his individual capacity because they state a factual basis for determining that the Sheriff knew the jail's system was so deficient as to expose mentally ill prisoners to substantial risk of significantly unmet serious medical needs—i.e., was unconstitutional[4]—and failed to properly attempt to correct it, and his action or inaction in this respect caused Gregory's injuries. Therefore the Sheriff has failed to demonstrate that he is entitled to dismissal on the basis that the pleading does not adequately state a claim against him.

**C. The Alleged Facts Do Not Overcome Qualified Immunity.**

Last, the Sheriff's motion argues that Plaintiffs' pleading is insufficient to overcome his right to qualified immunity. The motion to dismiss, brought before any discovery was conducted in the case, has the purpose of testing the sufficiency of the pleadings as to qualified immunity. *See Jackson v. City of Beaumont*, 958 F.2d 616, 618 (5th Cir. 1992). The Court reviews the sufficiency of the pleadings with the purpose of the qualified immunity doctrine in mind, which is to shield government officials not only

---

[4]   A prisoner has a Constitutional right to health care for serious medical needs. *E.g., Wagner v. Bay City, Texas*, 227 F.3d 316, 324 (5th Cir. 2000).

from personal liability, but from suit as well, "when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370–71 (5th Cir. 2011). *See also, Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), *overruled on other grounds*, *Pearson v. Callahan*, 555 U.S. 223, 233-44, 129 S.Ct. 808, 816-23 (2009).

Qualified immunity is a complete defense to government officials who perform discretionary functions only "insofar as their conduct does not violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Thompson v. Upshur County*, 245 F.3d 447, 456 (5th Cir. 2001). Qualified immunity does not provide officials with a license to engage in lawless conduct. *Harlow*, 457 U.S. at 819. Rather, "[w]here an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *Id*.

In that regard, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*." *Pasco v. Knoblauch*, 566 F.3d 572, 578–79 (5th Cir. 2009) (quoting *Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997); emphasis in original). This standard protects the balance between upholding constitutional rights and allowing government officials to effectively perform their duties, by limiting liability to those instances in which they can reasonably anticipate that their conduct is unlawful. *Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

The Supreme Court applies a two-prong test for determining whether an official is entitled to qualified immunity:  (1) whether a constitutional right would have been violated on the facts alleged, and (2) whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct thus rendering the official's conduct objectively unreasonable.  *Pearson v. Callahan*, 555 U.S. 223, 233-44, 129 S.Ct. 808, 816-23 (2009).   Once qualified immunity is pled, it is the Plaintiffs' burden to demonstrate, first by pleadings and then by proof, that either the Defendant is not eligible for the defense or that there is a fact issue for the jury as to whether the requirements of the defense are met.  *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005) (pleading of qualified immunity alters the usual burden of proof, placing it on the plaintiff).   As outlined above, the Court has determined that Plaintiffs have met the first step.

Plaintiffs must then demonstrate—by pleading sufficient facts at this stage—that the Sheriff's conduct violated a clearly established right, rendering it objectively unreasonable.  Plaintiffs' briefing in opposition to the qualified immunity defense relies exclusively on the basis that the Sheriff was only permitted to hold Gregory for the purpose of restoring his competency.  When the court-ordered institution was unable to accept Gregory's immediate transfer, Plaintiffs argue that the Sheriff, individually, was constitutionally compelled to either find an alternate treatment facility for restoring Gregory's competency or release him.  Plaintiffs have not identified, and the Court has not found, authority for this proposition.

It is true that the Supreme Court has determined that a person found incompetent to stand trial cannot be detained indefinitely when there is little hope for the restoration of that competency. *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). If the incompetent is held solely because of a criminal charge and he does not satisfy the requirements for civil commitment of those not charged with criminal violations (who enjoy stricter parameters for commitment and more lenient standards for release), then the incompetent's right to equal protection of the law is violated. *Jackson*, 406 U.S. at 730, 92 S.Ct. at 1854. Furthermore, if he is held longer than reasonably required to restore competency, his due process rights are violated. *Jackson*, 406 U.S. at 738, 92 S.Ct. at 1858.

While it recognized a constitutional right, the *Jackson* opinion did not address a Sheriff's duty—or any duty of the jurisdiction ordering detention—under these circumstances. In *Jackson*, the incompetent had been held in the designated pyscyhiatric facility for over three years. It was not the Sheriff who was holding him. The Supreme Court simply determined that the incompetent could not be detained any further without satisfying civil commitment requirements because there was no reasonable expectation that the detainee would regain his competence.

Plaintiffs rely on *Oregon Advocacy Center v. Mink*, 322 F.3d 1101 (9th Cir. 2003). That court took a step in the direction of a sheriff's duty by affirming a trial court's injunction against the Oregon State Hospital, requiring it to admit incompetent pretrial detainees for the purpose of restoring competency within seven days of the order finding them incompetent. The *Mink* case was brought against the only body designated by the

Oregon legislature to accept and treat such detainees—the State Hospital.  The case specifically rejected the suggestion that the case should have been brought against the county jail, and there was no suggestion at all that the sheriff or anyone else responsible for the transfer of the detainee was constitutionally mandated to take any specific action when the State Hospital would not accept the detainee.  Thus the step in the Sheriff's direction has not yet reached the jailhouse door.

Plaintiffs next rely on *Advocacy Center for Elderly and Disabled v. Louisiana Dept. of Health and Hospitals*, 731 F.Supp.2d 603 (E.D. La. 2010).  In that case, the court found the state's statutory framework for handling incompetent detainees to be unconstitutional.  In particular, the combination of statutes provided for periodic review of the status of incompetents who were not yet transferred to the state mental health facility, but did so under timing that allowed the incompetents to languish in parish jails for a year before any action was required.

The *Louisiana Department of Health* court, building on *Jackson* and *Mink*, issued an injunction requiring three Louisiana ***state*** officials[5] who were sued in their ***official*** capacities to accomplish the admission of incompetent detainees into the state mental health facility within 21 days of that court's order or any future state court order finding a criminal defendant incompetent to stand trial.  While the court's opinion would indicate that it had ordered an impossible action because the state mental health facility was already full, it was certainly designed to require the ***state*** to take some action to find a

---

[5]   These officials include the Secretary of the Department of Health and Hospitals, the Chief Executive Officer of the Eastern Louisiana Mental Health System, which is a component of the Department of Health and Hospitals, and the Director of the Forensic Services Division of the Eastern Louisiana Mental Health System.

viable remedy to prevent further violation of the rights of incompetent pretrial detainees. This is not, however, support for holding that a ***sheriff, individually,*** is constitutionally required to take any particular action in the face of a state court order that requires the Sheriff to assume custody of the detainee, does not include a deadline for transfer, and requires that transfer of a detainee be made to a facility that will not accept him.

Last, Plaintiffs rely on the decision in *Taylor v. Lakey*, No. D-1-GN-07-00837 (419th Dist. Ct., Travis County, 2012), *appeal pending*, No. 03-12-00207-CV (Tex. App.—Austin).  Plaintiffs did not attach a copy of this unpublished decision and the Court has not found any official findings of fact and conclusions of law or final judgment on Westlaw, Lexis, or through a generic internet search.  According to a letter ruling dated January 23, 2012 obtained through the Legislative Reference Library of Texas website (http://www.lrl.state.tx.us), the *Taylor* court determined that twenty-one (21) days is a reasonable time for an incompetent pretrial detainee to await transfer to a mental health facility.  On that basis the *Taylor* court apparently[6] permanently enjoined the Commissioner of the Texas Department of State Health Services to have a bed available for each incompetent pretrial detainee within twenty-one (21) days of receiving notice of a criminal court's commitment order.  This case is on appeal.

While the case law certainly identifies a constitutional issue in the failure to place incompetent pretrial detainees in the custody of an appropriate mental health facility within twenty-one (21) days of the court order committing them to a psychiatric effort to

---

[6]   The letter ruling expressly states that it does not constitute findings of fact or conclusions of law and directs counsel for plaintiffs to prepare an order, circulate it to opposing counsel for approval, and then send it to the court for signature.  The final order, if any, has not been supplied to this Court.

restore competency, those cases do not represent pre-existing law that dictates or truly compels (not just suggests or allows or raises a question about), the conclusion for every like-situated, reasonable government agent confronted with the issue.  In fact, the case remains on appeal.  Nothing in any of those cases compelled the Sheriff, individually, to take particular action.  It is beyond his authority as a County employee to cause the Texas Department of State Health Services to provide beds at any particular mental health facility.  And it would be contrary to the state court's order to release the detainee.  No clear law dictates his required response to this dilemma.

Under such circumstances, qualified immunity protects the Sheriff, individually, from liability for maintaining the status quo pending an opening for Gregory at a psychiatric facility.  Plaintiffs have failed to overcome qualified immunity to the extent that they depend upon the law regarding pretrial detention of criminal defendants who have been found incompetent to stand trial and who languish in jail an allegedly unreasonable amount of time pending availability of a facility that can restore their competence.  No other grounds for resisting qualified immunity were presented in their Response or Surreply.

The Court has inspected the entire pleading for any basis to eliminate the qualified immunity defense.  While there is some question as to the Sheriff's influence in negotiating the NaphCare contract, Plaintiffs have not specified any constitutional dictate that the Sheriff was on notice of and which he clearly failed to observe.  There is no mention of a particular quantity or quality of medical personnel that the Sheriff failed to provide for.  There is no minimum *per capita* expenditure required for health care of any

kind.  Neither is there an established minimum number of available medical personnel treatment hours that a jail facility must maintain.  There is no constitutionally compelled rejection of a contractor because of prior claims.  There is at this time no specific action well-established in the law that a sheriff, individually, must take to address the mental health or medical risks of incompetent pretrial detainees.  Instead, this particular "conditions of confinement" case triggers complex governmental issues outside of the Sheriff's individual control.

Therefore, while Plaintiffs have identified violations of constitutional rights somewhat related to the Sheriff's acts or omissions, they have failed to identify the specific action within his power that the Sheriff should have taken, and which all sheriffs should know they must take, to reduce or eliminate the deprivation of rights of incompetents such as Gregory.  For that reason, the Sheriff is entitled to qualified immunity from suit.  The Court GRANTS Sheriff Jim Kaelin's Motion to Dismiss (D.E. 55).

### THE CLAIMS AGAINST NUECES COUNTY

Plaintiffs have pled three claims against the County:  (1) civil rights claims under 42 U.S.C. § 1983; (2) violations of the Americans with Disabilities Act (ADA); and (3) violations of the Rehabilitation Act.  Each of these claims will be addressed below.

### A.  Section 1983 Claims

The County cannot be held liable for the individual unconstitutional acts of its employees under a *respondeat superior* theory.  *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).  However, acts taken by the Sheriff in his *official capacity* are

acts of the County's final policymaker with respect to the county jail and, hence, are acts of the County.[7]  TEX. LOCAL GOV'T CODE § 351.041; *Turner v. Upton County*, 915 F.2d 133, 136-37 (5th Cir. 1990); *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980).  Such acts of a final policymaker can support assessing constitutional liability against the County.  *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008).

### 1.  Conditions of Confinement

Plaintiffs allege that the County is liable for civil rights violations under both "conditions of confinement" and "traditional municipal liability" theories.  The "conditions" case has been outlined above in the discussion regarding the Sheriff's liability.  While the Sheriff is entitled to qualified immunity for that alleged liability in his individual capacity, the claim remains viable as to the County because the Sheriff is also sued in his official capacity.  The Court will not repeat its analysis of the viability of the "conditions" case.  As previously demonstrated, the Plaintiffs have alleged a viable civil rights claim under the "conditions of confinement" theory.

### 2.  Traditional Municipal Liability

The County's traditional municipal liability under § 1983 "requires proof of three elements:  a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom."  *Piotrowski, supra* at 578 (citing *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).  The County's

---

[7]   Only individuals, as opposed to the County, are entitled to qualified immunity to exempt them from liability for their discretionary acts.  So the prior holding dismissing the Sheriff, individually, from this action has no bearing on the treatment of the County or the Sheriff as an official representative of the County.  *Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985).

Motion (D.E. 60) challenges the existence of an actionable policy and "moving force" causation.[8]

### a.  The Pleading Alleges an Unconstitutional Policy

Plaintiffs clearly complain that the County's widespread and pervasive practices reveal a *de facto* policy of failing to provide for the mental health needs of pretrial detainees who are awaiting transfer to a state mental health facility for more than a few days.  This is reflected in an alleged failure to contract for the intense mental health services required "to provide crisis management of acute psychiatric episodes and stabilization of the mentally ill in the jail" (D.E. 47, p. 11) and complacent acceptance of the fact that many seriously disturbed mentally ill pretrial detainees remain in County custody for several months without treatment, awaiting transfer to a facility that is directed to restore competency to stand trial.

The *Jackson* case requires treatment of such a policy as unconstitutional because it is unconstitutional to incarcerate a mentally ill pretrial detainee under circumstances that are not designed to restore competency.  *Jackson*, 406 U.S. at 738.  Such a policy can also be actionable because acute psychiatric episodes can expose the detainee, or others who are in contact with him, to serious medical consequences, including assaultive behavior, self-mutilation, or suicide.  *E.g.*, *Woodall v. Foti*, 648 F.2d 268, 272 (5th Cir. 1981).  A deliberate or *de facto* policy that reflects indifference to this risk is

---

[8]   With respect to the first element, there is no substantial question that the pleading identifies the Sheriff as a policymaker who could be held responsible, through actual or constructive knowledge, for enforcing a policy that caused Gregory's injuries.  *Piotrowski, supra* at 578-79.  The Complaint not only refers to the Sheriff as a policymaker, but details instances of alleged actual or constructive knowledge of the policies at issue and their unconstitutional nature.

unconstitutional.  *E.g., Partridge v. Two Unknown Police Officers,* 791 F.2d 1182, 1187 (5th Cir. 1986).

The County's first challenge is that Plaintiffs' policy argument fails for lack of factual specificity, citing *Spiller v. City of Texas City*, 130 F.3d 162, 167 (5th Cir. 1997) (pleading rejected, in part, because allegations of racially discriminatory policies were conclusory).  However, Plaintiffs here have alleged such particular acts as (1) knowledge of the wait time for state mental health facilities, (2) knowledge of the number of detainees or prisoners on the waiting list for those facilities, (3) knowledge of the damage mentally ill detainees can do, and have done, to themselves without adequate mental health intervention; (4) choice of a medical contractor that is known to be ill-equipped to address serious mental health issues of the incompetent; and (5) approval of a contract for medical services that does not adequately staff the jail for mental or physical health issues as reflected in the specific monetary expenditure and required hours of time-on-duty of medical and mental health professionals.

Each of these allegations is supported by a factual recitation regarding the Sheriff's knowledge of specific incidents at the jail, along with actions he took or failed to take in response, and the Sheriff's own research and participation in the negotiations that led to the specific errant terms of the NaphCare contract and the use of NaphCare, in particular.  Such allegations are sufficiently factual and not conclusory.  Problems that are so common as to be generally known will trigger liability even if the specific application of that problem to Plaintiffs' decedent is not known.  *Farmer v. Brennan*, 511

U.S. 825, 843-44, 114 S.Ct. 1970 (1994) (officials need not anticipate who would fall victim when they had reason to know that someone likely would).

The County disputes the statistical significance of the Plaintiffs' recitation of less than $8 per inmate per day for medical and mental health care and a combined 50 hours of mental health professionals in a jail with an average daily population of 992 inmates, along with other statistical allegations and disclosure of particular incidents. The County relies on *Peterson v. City of Fort Worth*, 588 F.3d 838, 852 (5th Cir. 2009), which complained that statistics without context and isolated incidents do not establish an actionable policy.

*Peterson* was a summary judgment case and it addressed the sufficiency of the evidence to support the claims. Here, the Court is faced only with determining whether there are sufficient factual allegations to put the County on notice of a viable claim. While the Court declines to comment on whether the proof ultimately offered in this case will support a finding of a deliberate policy of unconstitutional mental health care at the County jail, the factual allegations are sufficient to satisfy the *Twombly/Iqbal* requirement that the cause of action be grounded in factual allegations and plausible.

The County further challenges Plaintiffs' allegations as not showing that any policy reflects "deliberate indifference" to constitutional rights. Citing *Board of County Commissioners v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 1390 (1997), the County suggests that Plaintiffs must show that the Sheriff or other policymaker had an actionable *animus* or intent to violate pretrial detainees' rights. The *Brown* case, however, reflects that a *de facto* policy, which remains in place despite high risks of constitutional

violations, is sufficient to demonstrate the "deliberate indifference" aspect of municipal liability:

> If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability.

*Brown*, 520 U.S. at 407. The applicable deliberate indifference standard considers "not only what the policymaker actually knew, but what he should have known, given the facts and circumstances surrounding the official policy and its impact on the [pretrial detainee's] rights." *Brumfield v. Hollins*, 551 F.3d 322, 331 (5th Cir. 2008) (quoting *Lawson v. Dallas County*, 286 F.3d 257, 264 (5th Cir. 2002)).

Here, the allegations include the propositions that (1) the existing level of mental health care was insufficient to address the serious medical needs of those held in the County jail (whether pretrial detainees or convicted criminals); and (2) the Sheriff was aware that incompetent pretrial detainees languished in his jail without mental health services adequate to the task for which they were held. Rather than take action to address this known constitutional problem, the Sheriff—according to Plaintiffs' allegations—perpetuated the problem by participating in the negotiation of a contract that would continue to underserve the mental health needs of those incarcerated and by continuing to accept offenders beyond his ability to house them in constitutionally adequate conditions.

These facts, if proven, satisfy the "deliberate indifference" requirement for County liability.

The County seeks dismissal of this policy claim against it by attempting to disassociate itself from the Sheriff, suggesting that the only relevant policymaker would be the commissioner's court, which is entrusted with contracting authority for medical services to be supplied to the jail.  D.E. 60, p. 21.  If the County's argument were to be adopted, it would provide blanket insulation for any unconstitutional conditions at the County jail.  The County Commissioners could simply close their eyes, defer all fact-finding and negotiations to the Sheriff, and blindly accept whatever the Sheriff came up with for the jail, right, wrong, or indifferent.  No such result is permitted under the law.

Plaintiffs have alleged, with factual support, that the Sheriff was the policymaker in this context.  D.E. 47, p. 2, 8-12.  There is a legal basis for such an allegation.  "Under Texas law, sheriffs are "final policymakers" in the area of law enforcement for the purposes of holding a county liable under § 1983.  *James v. Harris County,* 577 F.3d 612, 617 (5th Cir. 2009) (citing *Williams v. Kaufman County,* 352 F.3d 994, 1013 (5th Cir.2003)).  The Sheriff's inability to contract on his own does not nullify his knowledge and influence in the matter, as Plaintiffs have pled.

The County asserts that Plaintiffs have failed to allege causation because they have not addressed how any unconstitutional level of mental health or medical care attributable to the County resulted in Gregory's death from an untreated bacterial infection.  D.E. 60, p. 30.  Plaintiffs have alleged three levels of unconstitutional care:  (1) failure to place Gregory in a facility that could restore his competency; (2) failure to supply sufficient

mental health care to manage acute psychiatric episodes that result in injury; and (3) failure to supply sufficient medical care to address Gregory's infection or its aftermath. It is worth noting that at least one medical professional allegedly attributed Gregory's medical condition to constant standing and walking in his cell—a matter allegedly related to his psychological condition.

Gregory did not have to contract an infection and die from it to have suffered confinement—a deprivation of liberty—in violation of his due process rights when he was allegedly held an unreasonable amount of time without treatment to restore his competency. *Jackson*, 406 U.S. at 738; *Mink*, 322 F.3d at 1121.  While the *Mink* court held that the county jail was not the proper defendant for injunctive relief, it does not eliminate the County as a proper defendant for a claim for damages for past unconstitutional detention.

The County argues that *Jackson v. Indiana* did not provide a "promise of treatment" to detained incompetents but rather enforced a right to a speedy trial.[9]  D.E. 60, p. 40.  The Supreme Court holding in *Jackson* was that an incompetent pretrial detainee could only be held in state custody pending trial if that custody was designed to restore competency and was making progress toward that goal.  It requires release or civil commitment.  If the only reason for holding Gregory was because of the criminal mischief charge against him, then the County had to either (1) confine him in a facility that could restore his competency and was working productively toward that end with the

---

[9]   The decision has been variously described as recognizing a right of substantive due process and procedural due process.  *Foucha v. Louisiana,* 504 U.S. 71, 119, 112 S.Ct. 1780, 1806 (1992) (Thomas, J., dissenting); *Youngberg v. Romeo,* 457 U.S. 307, 321 n.27, 102 S.Ct. 2452, 2461 (1982).

ultimate goal of trying him for his crime within a reasonable time, or (2) release him or have him committed under the civil statutes.

Plaintiffs rightly suggest that there is a question of fact as to whether the County had other resources for Gregory's treatment, namely a private mental health facility or a Mental Health and Mental Retardation facility.  Yet there is certainly some question whether the nature of the commitment order and the state authority behind it impacts the County's authority in this regard.  The County argues in its Reply that the Sheriff had no choice but to house Gregory in the county jail because the state required that the Sheriff take custody and deliver Gregory to a state facility that would not accept him and the County was prohibited by law from releasing Gregory.  D.E. 80, pp. 15-16 (citing TEX. CODE CRIM. P. ARTS. 2.18 (sheriff's duty to keep in jail any person committed to jail by court order), 16.20 (legal requirements of commitment order)).

As the County continued to hold Gregory for trial, it had a constitutional duty, to do so only so long as it also provided competency restoration treatment, along with mental health and medical services at least meeting the substantive due process and Eighth Amendment rights owed convicted criminals.  Suggesting that the County had no obligation to provide the mental health services at issue here disregards the fact that Gregory had been deprived of his liberty and had been entrusted to the County's custody under circumstances in which he could not provide for his own care.  Whether or not the *Jackson* rule supplies a basis for relief, it remains the case that Plaintiffs have stated a claim against the County for the inadequate care of Gregory, who was obviously suffering from significant mental health and medical issues.

Plaintiffs further allege that the denial of psychological treatment to Gregory was causally connected to his death because his untreated psychological condition made Gregory unable to communicate properly with his health care providers, who, they allege, depend upon a patient's recitation of medical history, his history of the present illness, and his explanation of the status of his symptoms in order to be able to adequately treat a medical condition.

The Court finds that the pleadings allege an unconstitutional policy.[10]

### b. The Pleading Alleges that the County Policy was the "Moving Force" Behind Underlying Constitutional Violations.

The County's argument that Plaintiffs fail to satisfy the "moving force" requirement is, initially, based on an "episodic" view of the facts, suggesting that isolated errors of particular health care professionals does not evidence a systemic problem.  As detailed above and as confirmed in Plaintiffs' Response, Plaintiffs have plead a "conditions of confinement" case as against the County.  Plaintiffs essentially contend that the policies that understaffed the jail for mental health issues as well as medical issues prevented Gregory from getting both the mental health and medical attention his situation required.

In its Reply, the County argues that the "moving force" element is not properly pled even as to a "conditions" case.  Under this requirement, the policy "must be closely related to the ultimate injury."  *City of Canton v. Harris*, 489 U.S. 378, 391 (1989).  The

---

[10]   The County spends several pages briefing the lack of subjective knowledge for a deliberate indifference claim. However, that briefing treats the case as an "episodic" case.  As detailed above, this case has been pled as a "conditions of confinement" case as against the County.  The "episodic" briefing is thus irrelevant.

County has not identified a gap between (a) the County's policies regarding housing pretrial detainees and staffing for medical and mental health conditions of those in its custody, and (b) the injuries to, and death of, Gregory from medical and, allegedly, mental health conditions.   The County has not demonstrated that the § 1983 claims should be dismissed.

### B. ADA and Rehabilitation Act Claims

The Fifth Circuit has held that claims under Title II of the ADA and claims under § 504 of the Rehabilitation Act[11] be treated identically from a jurisprudential standpoint. *Bennett-Nelson v. Louisiana Board of Regents*, 431 F.3d 448, 454-55 (5th Cir. 2005); *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000).  To survive a motion to dismiss, Plaintiffs must appropriately plead:

> (1) that they are qualified individuals within the meaning of the Act; (2) that they are being excluded from participation in, or being denied benefits of, services, programs, or activities for which the [defendant] is responsible, or are otherwise being discriminated against by the [defendant]; and (3) that such exclusion, denial of benefits, or discrimination is by reason of their disability.

*Lightbourn v. County of El Paso*, 118 F.3d 421, 428 (5th Cir. 1997).

The County argues that Plaintiffs do not have a proper ADA/Rehabilitation Act claim because the acts do not provide a remedy for the disabled who complain of defects in the treatment they seek for their triggering disability, citing *O'Guinn v. Nevada Dept. of Corrections*, 468 Fed. Appx. 651, 653 (9th Cir. 2012).   "The ADA prohibits

---

[11] Both prohibit the denial of the benefits of government programs on the basis of disability.  42 U.S.C. § 12132; 29 U.S.C. § 794(a).

discrimination because of disability, not inadequate treatment for disability." *Simmons v. Navajo County*, 609 F.3d 1011, 1022 (9th Cir. 2010).

Plaintiffs rely on *Olmstead v Zimring*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). They argue that the Supreme Court has held that the ADA prohibits discrimination against the mentally ill by requiring the government to provide the treatment environment specifically prescribed for their psychiatric condition. But in *Olmstead*, the patients had been voluntarily committed and the prescribed environment was community-based treatment.

The discrimination issue was that patients with other maladies could get community-based treatment whereas the mentally ill were being unnecessarily institutionalized. *Olmstead*, 527 U.S. at 601. The Court relied heavily on Congressional findings giving rise to the ADA that segregating and isolating persons with disabilities was a discriminatory practice. And the Court was careful to note that its decision took into account what constituted a reasonable accommodation, given the state's resources and other demands on those resources. It expressly found that community-based treatment costs the state less than institutionalization.

Neither the Congressional concern nor the Supreme Court's holding apply to this case, where Gregory would be segregated and isolated whether he remained in the county jail or was transferred to the state mental health institution. Additionally, the Court warned that the *Olmstead* holding did not establish any particular level of treatment. "We do not in this opinion hold that the ADA imposes on the States a 'standard of care'

for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.' " *Olmstead*, 527 at 603 n.14.

While the Constitution may require certain mental health treatment for pretrial detainees, the ADA does not compel the County to provide any particular treatment as a matter of preventing discrimination. Because Plaintiffs have not identified any other basis for an action under the ADA or Rehabilitation Act, those claims are DISMISSED.

## THE CLAIMS AGAINST NAPHCARE, INC. AND SUZAN SALTER

Plaintiffs sued NaphCare, Inc. (NaphCare) as having contracted with Nueces County

> to provide reasonable and necessary medical, mental health, nursing, dental care, and related supporting services to all inmates under the custody and control of the County Sheriff. NaphCare was acting under color of law, and was responsible for providing the constitutionally required medical and mental health care to prisoners at the jail.

D.E. 47, pp. 2-3, 8. Susan Salter (Salter) is sued in her individual capacity while acting under color of law. *Id*. at 3. According to Plaintiffs,

- NaphCare could not provide competent medical and mental health care at the rates in the Nueces County Contract. D.E. 47, pp. 9-10.

- NaphCare employed insufficient numbers of medical and mental health care providers to meet the reasonable and necessary mental health needs of the inmates at the Nueces County Jail. *Id*., pp. 9-10.

- NaphCare hired Dr. Badea-Mic even though it knew or should have known that she had a history of challenges from the Texas Board of Medical Examiners. *Id*., p. 14.

- Dr. Badea-Mic failed to assure Gregory's transfer to an inpatient mental health facility and failed to require professional counselors under her supervision to properly monitor Gregory and knew about, but failed to treat his worsening, serious psychological condition. *Id.*, pp. 14-15.

- When Gregory first presented with concern about his legs and red and swollen feet, NaphCare employees were dismissive and failed to perform a substantial physical exam or provide any treatment. *Id.*, p. 15.

- Gregory's serious mental health and physical health needs were obvious to health care providers. His legs began turning red, draining fluid and saturating his pants, and then ulcerated and became infected with bacteria. The infection invaded his blood stream, destroying his body organs, causing irreversible shock, and ultimately death. *Id.*, pp. 15-16.

- Salter, a physician's assistant, saw Gregory's legs, knew of his past complaints, yet ordered only a diuretic and failed to conduct any testing, do any lab work, or culture any wounds. *Id.*, p. 16.

- When Gregory fell in his cell, NaphCare nurses documented a body temperature of 95.6°, cleaned his leg wounds, but did not further address his serious condition or seek a physician or hospital's assistance. *Id.*, p. 17.

- When Gregory was found unresponsive in his cell and was cold to the touch, NaphCare medical personnel could not obtain a blood pressure or oxygenation reading, yet moved him to the jail's infirmary rather than seek emergency hospital care. *Id.*, p. 17.

- NaphCare, Dr. Badea-Mic, and Salter were negligent in failing to provide appropriate medical care under the above circumstances. *Id.*, pp. 22-23.

- NaphCare was negligent in hiring incompetent and insufficiently trained medical and mental health providers. *Id.*, p. 23.

- NaphCare, Dr. Badea-Mic, and Salter's conduct constituted gross negligence. *Id.*, p. 24.

With those allegations, Plaintiffs sue NaphCare for § 1983 violations, ADA/ Rehabilitation Act violations, and, along with Salter, for negligence and gross negligence.

### A. Section 1983 Claims

NaphCare's challenge to the adequacy of the § 1983 claim is based in part on the Eighth and Fourteenth Amendments' requirement that it have subjective knowledge of the substantial risk of serious harm but responds with deliberate indifference.   It appropriately denies *respondeat superior* liability.   See above discussion as to the vicarious liability of the County.  It is undisputed that NaphCare was acting under color of law on behalf of the County and its conduct is thus evaluated as a "conditions of confinement" case and, alternatively, under "traditional municipal liability."

Fairly read under either theory, Plaintiffs' Complaint alleges that NaphCare historically, and in this case, knowingly understaffed the jail such that it could not meet the serious medical needs of the jail population.  In Gregory's case, his mental condition had induced one physician to prescribe medication that NaphCare did not deliver and his medical condition, as Plaintiffs allege, was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897-98 (6th Cir. 2004).

While NaphCare argues that there are no pleadings that it "refused to treat Cheek, ignored his complaints or intentionally treated him incorrectly," (D.E. 81, p. 7), that argument is not accurate under the record.  The Complaint cites refusals, delay, and

failure to treat when NaphCare personnel failed to provide prescribed psychiatric medications (D.E. 47, pp. 7, 15), when they dismissed Gregory's complaints with the suggestion that his problems were simply standing all day (*Id.*, p. 15), when they did not treat the infection from his wounds (*Id.*, pp. 16-17), and when they took him to the infirmary rather than to a hospital when his problems became emergent (*Id.*, p. 17). Such allegations reflect a factual basis for deliberate indifference. *Blackmore, supra*.

As a part of the practice of providing inadequate care, the Complaint also alleges that NaphCare hired Dr. Badea-Mic, who it knew or should have known was not competent to render the necessary services. That was identified as NaphCare's pattern, and the contract amount virtually ensured insufficient quantity and/or quality of staffing in Nueces County. Under NaphCare's own authority, a constitutional violation can be predicated on a pattern of past practices. *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001) (citing *Snyder v. Trepagnier*, 142 F.3d 791, 798-99 (5th Cir. 1998)).

Plaintiffs' Complaint includes a litany of past instances of constitutional allegations based on deliberate indifference to serious medical needs against NaphCare, including a policy of cutting costs and maximizing profits to the detriment of the patients it serves. D.E. 47, pp. 9-10. In addition to this alleged historical pattern, the Complaint also alleges a specific contractual scenario of consideration paid and medical professional hours promised between Nueces County and NaphCare by which the county jail would be understaffed such that NaphCare could not adequately serve the serious medical and mental health needs of the prisoners housed in the jail going forward. D.E. 47, pp. 8-10.

For pleading purposes, this suffices to take this case past the dismissal stage. Those allegations are fact-based and not impermissibly conclusory. NaphCare may prove the prior allegations baseless and can challenge the consideration and man-hours issues on their merits, but those are matters for discovery and, if appropriate, summary judgment procedure.

### B.  State Law Negligence Claims

The Complaint is replete with allegations regarding Gregory's mental health and medical needs and how they were not met, as set out above. The allegations paint a picture of a man who suffered significant mental illness that went untreated despite obvious symptomatic conduct and a physician's orders for medication and transfer. The allegations also reveal a gruesome medical condition with readily apparent red, swollen, and seeping extremities that eventually developed wounds capable of bacterial infection, all of which went largely untreated. The treatment allegedly offered was the proverbial "too little, too late."

The Complaint alleges that Salter was a physician's assistant who saw these symptoms and failed to adequately treat them or refer Gregory's problems to a physician. The Complaint alleges that other NaphCare employees were also involved in the errors and omissions that resulted in Gregory's death from his medical condition. Negligence claims under Texas law, unlike constitutional claims, permit *respondeat superior* liability against NaphCare. *E.g., St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 541-42 (Tex. 2002). The Court finds that the allegations are adequate to state negligence claims against NaphCare and Salter.

### C.  Qualified Immunity

NaphCare and Salter seek dismissal of this action against them on the basis of qualified immunity, citing three cases.  In *Wilson v. Layne*, 526 U.S. 603, 609 (1999), police officers were held entitled to qualified immunity for Fourth Amendment violations.  Nothing in this case sheds light on the qualified immunity claim of NaphCare and Salter.  Likewise, in *Thompson v. Upshur County*, 245 F.3d 447, 456 (5th Cir. 2001), the case involved only two sheriffs and a government-employed jailer—not medical personnel.  While the jailer who allegedly deprived the detainee of medical care was eligible for qualified immunity, immunity was denied at the summary judgment stage because her actions could be found objectively unreasonable.  This case is not helpful to the determination of the issues here, other than to confirm that medical attention that is delayed or denied can constitute deliberate indifference.

In NaphCare and Salter's third case, *West v. Atkins*, 487 U.S. 42, 56, 108 S.Ct. 2250 (1988), a part-time physician who worked at a state prison hospital was held to work "under color of law."  The case did not address any issue of immunity.  NaphCare and Salter argue that contract work for the County—providing medical services to the jail—constitutes "acting under color of state law" for § 1983 purposes.  *West, supra.* This proposition is not disputed, as Plaintiffs have sued them as acting under color of law.  D.E. 47, pp. 2-3.

The problem is that NaphCare and Salter assume that the qualified immunity defense naturally follows the "under color of law" status.  To the contrary, the Supreme Court has held that whether Defendants acted "under color of law" because they were

performing a governmental function is not determinative of the immunity issue.

*Richardson v. McKnight*, 521 U.S. 399, 117 S.Ct. 2100 (1997).

> The Court has sometimes applied a functional approach in immunity cases, but only to decide which type of immunity— absolute or qualified—a public officer should receive.  And it never has held that the mere performance of a governmental function could make the difference between unlimited § 1983 liability and qualified immunity, especially for a private person who performs a job without government supervision or direction.  Indeed a purely functional approach bristles with difficulty, particularly since, in many areas, government and private industry may engage in fundamentally similar activities, ranging from electricity production, to waste disposal, to even mail delivery.

*Id.*, 521 U.S. at 408-09 (citations omitted).

Relying on *Richardson*, Plaintiffs argue that NaphCare and Salter are not entitled to qualified immunity because they are (1) a private corporation and (2) a private individual employed by that private corporation.  Just as performing a governmental function does not automatically provide qualified immunity, being a private entity does not automatically deprive the worker of qualified immunity.  The issue turns on the historical context of the work and public policies behind the evolution of immunity doctrines that apply to foster the proper operation of government.  *Id.*, 521 U.S. at 409-14.

In *Richardson*, the entire prison was under private operation.  Here, only the mental health and medical part of the operation was in private hands.  So this Court considers the reasoning of *Richardson* in the narrower context of medical services and the application of those principles to the scope of services provided and the amount of

governmental supervision at issue.  In particular, NaphCare and Salter argue that they were "working at the direction of the facility."  D.E. 81, p. 3.  However, they do not provide any detail of what they mean by "facility" and what medical credentials, supervisory authority, or amount of attention is provided by that "facility."  As detailed below, the Court finds no meaningful distinction between the scope of operations and supervision involved in *Richardson* and that at issue here.

"First, the most important special government immunity-producing concern— unwarranted timidity—is less likely present, or at least is not special, when a private company subject to competitive market pressures operates a prison."  *Id*. 521 U.S. at 409.  Free enterprise competition is seen as a proper incentive to do the job right so that the worker can continue as a government contractor.  The expectation is that good results will be balanced against appropriate fees for services.  As in *Richardson* and according to the Complaint, those forces appear to be present here, as NaphCare entered into a competitive bidding process to get the Nueces County contract and is a large corporation organized to perform the specific work entrusted to it independently and without government supervision of the day-to-day work.

"Second, 'privatization' helps to meet the immunity-related need 'to ensure that talented candidates' are 'not deterred by the threat of damages suits from entering public service.' "  *Id*. 521 U.S. at 411 (citations omitted).  A private corporation does not have civil service law constraints and thus has greater freedom to provide employment incentives to attract good workers and can provide appropriate insurance against individual liability.  Third, immunity is designed to avoid the distraction of officials from

the work being done in the course of their governmental term.  *Id.* 521 U.S. at 411.  As the *Richardson* opinion sets out, some distraction must be anticipated in order to protect important rights and, where the major policy decisions remain in the hands of the public official, subjecting private workers to lawsuits arising from their conduct is not such a debilitating event for overall operations.

Defendants rely on *Filarsky v. Delia*, 132 S.Ct. 1657, 182 L.Ed.2d 662 (2012), in which the Supreme Court applied qualified immunity to a private attorney.  The attorney was hired on a limited basis to investigate a particular employment claim.  The Court was expressly interested in the question whether the right to qualified immunity that would be accorded to a legal employee who is employed on a full-time basis would still apply if that employee were working only on a part-time basis.  The Court held that there should be no such distinction because of the historical use of private individuals for such public service.

The *Filarsky* opinion specifically addressed *Richardson* and applied the same analysis.  It noted that Filarsky had worked closely with government officials and any suit against that private attorney would necessarily involve those government officials, thus affecting those officials' zealous pursuit of government objectives, deterring a highly specialized and competent individual from accepting public employment, and distracting the government officials from their work with litigation.  *Filarsky*, 132 S.Ct. at 1665-66.  In sum, *Filarsky* distinguished *Richardson* because of the difference between the government hiring an individual to do its work and hiring a corporation, with its market incentives and organizational structure replacing the role of the government in the

employment relationship.  When explaining why its result was different, the *Filarsky* opinion extracted from *Richardson* the language, "a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertak[ing] that task for profit and potentially in competition with other firms"  *Filarsky*, 132 S.Ct. at 1667 (quoting *Richardson*, 521 U.S. at 413).

The *Richardson* court found that prison-related operations, historically, have not always been exclusively governmental.  Public-private cooperation is not new. Examining the underlying bases for the development of qualified immunity indicates that it should not protect the private delivery of health care to prisoners.  Barring those who are injured from obtaining a remedy from a private wrongdoer is not justified in this context.  While the *Richardson* holding is, expressly, a narrow one, the actions of private health care providers, NaphCare and Salter, are within its confines.

A number of cases, after considering the *Richardson* holding, have denied qualified immunity to private medical personnel who act under color of law.  In *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008), the court applied the same considerations used in *Richardson* and concluded:

> [L]ike the company in *Richardson*, CMS is a for-profit entity that has undertaken the major administrative task of providing health care to Macomb County inmates, operates with little supervision from Jail authorities, and is subject to the pressures of the marketplace. Under these circumstances, extending qualified immunity to Defendant nurses would do little to quell the "concern that threatened liability would, in Judge Hand's words, 'dampen the ardour of all but the most

> resolute, or the most irresponsible,' public officials" and thus
> qualified immunity must be denied in this circumstance.

The *Harrison* court also cited other federal circuit courts that had come to the same or similar conclusion: *Rosewood Services, Inc. v. Sunflower Diversified Services*, 413 F.3d 1163, 1169 (10th Cir. 2005) (applying "market forces" element to deny qualified immunity to non-profit organization supplying services to the developmentally disabled under government contract); *Jensen v. Lane County*, 222 F.3d 570, 579 (9th Cir. 2000) (denying qualified immunity to contract psychiatrist); *Hinson v. Edmond*, 192 F.3d 1342, 1347 (11th Cir. 1999), *amended*, 205 F.3d 1264 (11th Cir. 2000)  (finding no reason to distinguish privately employed physicians from privately employed prison guards and denying qualified immunity; withdrawing any opinion on the merits of the constitutional claim); *Halvorsen v. Baird*, 146 F.3d 680, 685-86 (9th Cir. 1998) (non-profit detoxification facility not entitled to qualified immunity).

In *McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012), the Sixth Circuit called its earlier *Harrison* decision into doubt, criticizing its cursory treatment of the question of historical immunity.  Then, after a more extensive investigation into the history of physician liability, concluded that the *Harrison* holding was correct, there was no historical immunity for doctors in the common law, and no qualified immunity should now apply simply because doctors work pursuant to a government contract.

While the Fifth Circuit has cited *Richardson* on a number of occasions, none of those cases have squarely addressed the question of whether privately employed medical personnel who work with prisoners are entitled to qualified immunity.  *See generally*,

*United States v. Thomas*, 240 F.3d 445, 448 (5th Cir. 2001); *Walter v. Horseshoe Entertainment*, 483 Fed. Appx. 884, 886 (5th Cir. 2012); *United States ex rel. Barron v. Deloitte & Touche, L.L.P.*, 381 F.3d 438, 443 (5th Cir. 2004); *Rosborough v. Management & Training Corp.*, 350 F.3d 459, 460 (5th Cir. 2003); *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 488 (5th Cir. 2001).

Given the opinions of other circuits that deny qualified immunity in similar circumstances and NaphCare and Salter's failure to direct this Court to any circuits that would grant qualified immunity in these circumstances after *Richardson*, the Court must conclude that private medical personnel who provide services to pretrial detainees are not entitled to qualified immunity.  For these reasons, the Court need not reach the question whether the Plaintiffs' pleadings state facts that, if proven, are sufficient to overcome the qualified immunity defense.   The Court DENIES the Motion with respect to the application of qualified immunity and strikes the defense from the pleadings of NaphCare and Salter.

### D.  ADA and Rehabilitation Act Liability

NaphCare and Salter seek a dismissal of the Plaintiffs' complaints under the ADA and Rehabilitation Act.  For the same reasons discussed above with respect to the County, the Court GRANTS the motion on that basis.

## CONCLUSION

For the reasons set out above, the Court DISMISSES all claims against Sheriff Kaelin in his individual capacity pursuant to qualified immunity.  The Court DISMISSES all claims based on the ADA and Rehabilitation Act.  In all other respects, the Motions are DENIED.

ORDERED this 5th day of August, 2013.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE